**ORIGINAL**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

$\mathcal{D}\mathcal{W}$

APR 7 - 2004

LUTHER ~~D. THOMAS~~, Clerk
By: *J. Pinckney*
Deputy Clerk

|  |  |
|---|---|
| ROBERT GARFIELD individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>NDCHEALTH CORPORATION, WALTER M. HOFF, and RANDOLPH L.M. HUTTO,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Civil Action No. **1:04 CV 0970**

**MHS**

CLASS ACTION COMPLAINT
FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS

JURY TRIAL DEMANDED

Plaintiff makes the following allegations, except as to allegations specifically pertaining to plaintiff and plaintiff's counsel, based upon the investigation undertaken by plaintiff's counsel, which investigation included analysis of publicly-available news articles and reports, public filings, press releases and other matters of public record.

**NATURE OF THE ACTION**

1.     This is a class action on behalf of all purchasers of the common stock of NDCHealth Corporation ("NDC" or "the Company") during the period of October 1, 2003 through and including March 31, 2004 (the "Class Period"),

FORMS RECEIVED
Consent To US Mag. ✓
Pretrial Instructions ✓
Title VII NTC JC

1

seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.    Throughout the Class Period, defendants issued quarter after quarter of strong financial results. Defendants failed to disclose that these stellar financial results were only made possible through improper revenue recognition practices in violation of Generally Accepted Accounting Principles ("GAAP"). On April 1, 2004, before the market opened, defendants shocked the market by announcing that NDC would delay it will delay the release of its fiscal third-quarter financial results as it "reviews some aspects of how it records revenue". The Company said the review relates to the timing of sales recognition in its value-added reseller channel in NDC's physician business unit.

3.    In response to the news concerning NDC's previously undisclosed accounting issues, the price of NDC stock dropped nearly 20% to close at $22.70 on unusually large trading volumes of nearly 4.8 million shares traded - - far greater than NDC's average daily trading volume of about 298,000 shares.

## JURISDICTION AND VENUE

4.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331, 1337 and 1367 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

2

5. This action arises under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § § 78j(b) and 78t(a)) and Rule 10b 5 promulgated thereunder (17 C.F.R. § 240.10b 5).

6. Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) and (c). Substantial acts in furtherance of the alleged fraud and/or its effects have occurred within this District and NDC maintains its corporate headquarters in this District at NDC Plaza, Atlanta, Georgia, 30329.

7. In connection with the acts and omissions alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national common stock markets.

## PARTIES

8. Plaintiff purchased NDC common stock during the Class Period, as set forth in the accompanying certification which is incorporated herein by reference, and was damaged thereby.

9. Defendant NDC is a provider of health information services for pharmacy, hospital, physician pharmaceutical and payer businesses.

3

10. The individual defendants, at all times relevant to this action, served in the capacities listed below and received substantial compensation:

| **Name** | **Position** |
| --- | --- |
| Walter M. Hoff | Chief Executive Officer |
| Randolph L.M. Hutto | Chief Financial Officer |

11. The Individual Defendants, as senior officers and/or directors of NDC were controlling persons of the Company. Each exercised their power and influence to cause NDC to engage in the fraudulent practices complained of herein.

12. Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of NDC stock, by disseminating materially false and misleading statements and/or concealing material adverse facts.

## MOTIVE, OPPORTUNITY AND KNOWLEDGE

13. Because of their Board memberships and/or executive and managerial positions with NDC, each of the Individual Defendants had access to the adverse non-public information about the business, finances, markets and present and future business prospects of NDC particularized herein via access to internal corporate documents, conversations or connections with corporate officers or employees, attendance at management and/or Board of Directors' meetings and

4

committees thereof and/or via reports and other information provided to them in connection therewith.

14.    Defendants had a duty to promptly disseminate accurate and truthful information with respect to NDC's operations and financial condition or to cause and direct that such information be disseminated and to promptly correct any previously disseminated information that was misleading to the market. As a result of their failure to do so, the price of NDC common stock was artificially inflated during the Class Period, damaging plaintiff and the Class.

15.    The Individual Defendants, because of their positions with NDC, controlled the contents of quarterly and annual reports, press releases and presentations to common stock analysts. Each Individual Defendant was provided with copies of the reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non public information available to them but not the public, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then false and misleading. As a result, each of the Individual Defendants is responsible for the accuracy of NDC's corporate releases

5

detailed herein as "group-published" information and is therefore responsible and liable for the representations contained therein.

16.     Each of the defendants is liable as a primary violator in making false and misleading statements, and for participating in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of NDC common stock during the Class Period.  All of the defendants had motives to pursue a fraudulent scheme in furtherance of their common goal, i.e., inflating the reported profits of NDC and the trading price of NDC common stock by making false and misleading statements and concealing material adverse information.  The fraudulent scheme and course of business was designed to and did:  (i) deceive the investing public, including plaintiffs and other Class members; (ii) artificially inflate the price of NDC common stock during the Class Period; (iii) cause plaintiff and other members of the Class to purchase NDC common stock at inflated prices; and (iv) conceal and cover-up the true financial condition of NDC.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

17.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons who purchased or otherwise acquired NDC common stock between October 1, 2003 and March 31, 2004, inclusive (the "Class Period"), and who were damaged

thereby. Excluded from the Class are defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of NDC and the directors, officers and employees of NDC or its subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

18.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members of the Class located throughout the United States. As of April 1, 2004, there were reportedly more than 35 million shares of NDC stock outstanding. Throughout the Class Period, NDC common stock was actively traded on the NYSE (an open and efficient market) under the symbol "NDC". Record owners and other members of the Class may be identified from records maintained by NDC and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in common stock class actions.

19.    Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

7

20.   Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and common stock litigation.

21.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)   whether the federal common stock laws were violated by defendants' acts and omissions as alleged herein;

(b)   whether defendants participated in and pursued the common course of conduct complained of herein;

(c)   whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, finances, financial condition and prospects of NDC;

(d)   whether statements made by defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, value, performance and prospects of NDC;

8

(e)    whether the market price of NDC common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

(f)    the extent to which the members of the Class have sustained damages and the proper measure of damages.

22.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this suit as a class action.

**Materially False Statements During the Class Period**

23.    On October 1, 2003, defendants issued a press release announcing first quarter results.  The press release stated:

> NDCHealth Corporation (NYSE: NDC) today announced financial results for its first quarter ended August 29, 2003.  Revenue increased to $108.9 million from $100.1 million in the first quarter of fiscal 2003.  Net income in the first quarter of fiscal 2004 was $7.4 million, or $0.21 per diluted per share, compared with net income of $11.2 million, or $0.32 per diluted share, in the first three months of fiscal 2003.
>
> Results for the first quarter of fiscal 2004 include a restructuring charge of $1.5 million,  or $0.03 per diluted share, primarily related to

9

streamlining the organization, including the integration of the TechRx acquisition into NDCHealth. First quarter results were, and full-year 2004 results are expected to be, affected by increased interest expense related to the company's debt refinancing completed in November 2002 and a step up in corporate and other costs previously disclosed in its fiscal 2003 year-end report.

24. Commenting on NDC's quarter, Hoff stated:

We showed solid progress in executing against the eight quarter plan we announced at the beginning of our fiscal year, highlighted by the growth in revenue and net cash from operating activities during our seasonally slow first quarter. Our strategy to increase revenue per claim by selling value-adding solutions that improve our customers' cash flow and profitability is showing success. We remain focused on controlling our corporate costs and delivering new products and services that will provide additional revenue streams in both our Network Services & Systems and Information Management businesses.

Based on our first quarter results and our current outlook, we have no changes to our previously issued guidance for fiscal 2004. We estimate that revenue will be approximately $475 to $490 million and diluted earnings per share will be in the range of $1.08 to $1.25, including restructuring charges. As we previously disclosed, we expect to incur restructuring charges totaling $0.05 to $0.07 per share in the first half of this year, which includes the $0.03 restructuring charge in the first fiscal quarter. We expect to continue to be a strong generator of cash, with fiscal 2004 net cash provided by operating activities in the range of $105 to $115 million.

25. On December 22, 2003, NDC announced the completion of a renegotiated $225 million credit facility agreement with its current syndicate of U.S. banks.

10

The company amended its existing $125 million term loan to reduce the variable interest rate from 400 basis points above LIBOR with a LIBOR floor of two percent to a rate of 275 basis points above LIBOR with no floor. The revised credit agreement also eliminated and relaxed certain covenants to provide added corporate flexibility, and continues the ongoing $100 million revolving credit facility, reducing the rate by 50 basis points to 250 basis points above LIBOR. The margin above LIBOR can vary according to NDCHealth's leverage position and credit ratings. Commenting on the credit facility, NDC stated:

This amended $225 million credit facility provides NDCHealth with increased financial flexibility and lowers our current interest expense by approximately $625,000 per quarter, partially offset by amortization of refinancing expenses totaling approximately $100,000 per quarter. This reduction is before any loan prepayments we may make in future periods.

26.    On January 7, 2004, defendants issued a press release announcing second quarter financial results. The press release stated:

NDC today announced financial results for its second quarter ended November 28, 2003. Revenue increased to $115.2 million from $105.3 million in the second quarter of fiscal 2003.

Net income in the second quarter of fiscal 2004 was $8.7 million, or $0.25 per diluted per share, compared with net income of $12.7 million, or $0.36 per diluted share, in the same quarter of fiscal 2003. As previously disclosed, the fiscal 2004 second quarter results included a restructuring charge of $2.5 million, or $0.04 per diluted share primarily related to organizational consolidation. The First Call consensus analyst expectation was $0.27, but does not include the $0.04 restructuring charge.

For the six-month period ended November 28, 2003, net cash provided by operating activities grew to $54.6 million from the $40.6 million reported in the same period of fiscal 2003.

11

As expected, net income and earnings per share results in the second quarter of fiscal 2004 were reduced by increased interest expense related to the company's debt refinancing completed in November 2002 and a step up in corporate and other costs previously disclosed in its fiscal 2003 year-end report. On December 19, 2003, NDCHealth completed the renegotiation of its $225 million Credit Facility, which increases the company's financial flexibility and will lower its future net interest expense by approximately $525,000 per quarter. This reduction is before any loan prepayments the company may make in future periods.

"We delivered another solid quarter of progress in executing against our eight quarter plan, highlighted by consistent growth in revenue and net cash from operating activities," commented Walter Hoff, chairman and chief executive officer, NDCHealth. "Our strategy of selling solutions to increase our revenue per claim by improving customer cash flow and profitability is working. Our sales to hospitals have increased dramatically, and we are continuing to pursue a number of pharmacy solution sales, which lead us to believe we will achieve our goals and objectives in the second half of fiscal 2004.

"We also experienced strong growth in our German Information Management business during the quarter, and were successful in selling additional base compensation and targeting and our new Insight and Impact solutions domestically. In addition, our Physician product sales showed good sequential growth, physician claims transactions increased and electronic prescription volume continues to rise," Mr. Hoff continued. "We remain focused on delivering new products and services that create value for our customers and generate additional revenue streams in both of our business segments, as well as controlling our corporate costs and leveraging the scale of our largely fixed cost infrastructure to drive a sustainable trend in margin improvement."

27.    With respect to guidance for the remainder of 2004, the press release stated:

> Based on the company's first half results and its current outlook, management's financial guidance is unchanged for fiscal 2004. Full-year revenue is estimated to be approximately $475 to $490 million, and NDCHealth will continue to be a strong generator of cash, with net cash provided by operating activities expected to be in the range of $105 to $115 million for the current fiscal year. In addition, management estimates that diluted earnings per share will be in the range of $1.08 to $1.25, including the first half restructuring charges of $0.07 per diluted share but excluding the impact of lower interest expense and any additional restructuring charges that may occur in the second half of fiscal 2004.

28.    On January 7, 2004, defendants filed a quarterly report on Form 10-Q repeating the financial results for the second quarter of 2004 detailed above.    The 10-Q was signed by the defendants, and included the following assurance regarding the Company's accounting practices:

> We have prepared the financial statements included herein, without audit, pursuant to the rules and regulations of the Securities and Exchange Commission. Certain information and footnote disclosures normally included in financial statements prepared in accordance with generally accepted accounting principles have been condensed or omitted pursuant to such rules and regulations, although we believe the disclosures are adequate to make the information presented not misleading. In addition, certain reclassifications have been made to the fiscal 2003 consolidated financial statements to conform to the fiscal 2004 presentation. . . In the opinion of management, these financial statements reflect all adjustments necessary to present fairly the financial position, results of operations, and cash flows for the interim periods presented.

29.    The 10-Q added, with respect to NDC's revenue recognition practices:

**Revenue** – In accordance with criteria set forth in Staff Accounting Bulletin No. 101, "Revenue Recognition in Financial Statements," Statement of Position No. 97-2, "Software Revenue Recognition" and other authoritative literature, we recognize revenue when persuasive evidence of an agreement exists, delivery and performance has occurred, there is a fixed and determinable sales price, and collectibility is reasonably assured.

In many cases, our physician systems are sold indirectly through value added resellers, or VARs. Because the VARs provide many of the services that we would otherwise provide (such as contract support, advertising, etc.), we provide them allowances to cover their cost of providing these services. We record revenue in accordance with Emerging Issues Task Force Issue ("EITF") No. 01-09, "Accounting for Consideration Given by a Vendor to a Customer or Reseller of the Vendor's Products," which requires that certain allowances be treated as reductions in revenue and allows other allowances, for which we receive separable, identifiable and quantifiable benefits, to be recorded as revenue and operating expense.

30.    The 10-Q described an agreement with an information management company, paid for using NDC stock as consideration:

On December 31, 2003 we entered into a seven-year exclusive license agreement with ArcLight Systems LLC, an information management company owned by a number of retail pharmacies and a major healthcare and distribution company. This agreement should allow us to enhance the quality, speed and accuracy of our base compensation and targeting products, create additional revenue streams by extending the capabilities of our new Insight solutions, reduce our data handling costs, and improve our revenue-to-data cost coverage ratio. As consideration for this exclusive license to ArcLight's assets, we issued 381,098 shares of unregistered NDCHealth common stock and a five-year warrant to purchase an additional 381,098 shares of NDCHealth common stock at an exercise price of $26.24 per share. We will also

14

pay ArcLight royalties on product sales utilizing ArcLight data. If the agreement is extended an additional three years, then ArcLight will receive an additional $10 million in either cash or NDCHealth common stock at ArcLight's option.

31.    The 10-Q added:

## Second Quarter Operating Summary

In order to achieve this plan, we have set our execution strategies to: grow revenue through the sales of integrated and value-adding solutions; control operational and administrative costs to realize margin improvement; and generate significant cash to reduce debt. In our second fiscal quarter ended November 28, 2003, we made solid progress against these execution priorities.

## Second Quarter Financial and Business Review

•      Revenue grew 9.4%, to $115.2 million from $105.3 million in the same quarter last year. Revenue per claim increased in Pharmacy, and claims volume expanded as we grew market share. In our Hospital business, new sales at a higher revenue per claim rate increased significantly, with revenue to be recognized over time as transaction volume grows after installation of the units. In our Information Management segment, our German operation had solid growth, and we were successful in selling additional base compensation and targeting products as well as our new Insight and Impact solutions domestically. As expected, in comparison to the same quarter a year ago, revenue growth in our fiscal 2004 second quarter was impacted by our emphasis on solution selling in our Network Services and Systems segment resulting in an increase in recurring revenue as a percentage of total revenue but also delaying certain revenue recognition until later quarters.

•      Second quarter Operating income was $21.3 million versus $23.8 million in the second quarter of fiscal 2003 resulting in an expected and previously announced decline in operating margin to

15

18.5% from 22.6% in the second quarter of fiscal 2003. These results were impacted by:

• The previously announced restructuring charge of $2.5 million, related primarily to compensation costs as a result of continued streamlining of the organization;

• An increase in Sales, general and administrative expense of $2.7 million due to higher corporate costs as previously disclosed;

• An increase in Depreciation and amortization expense of $1.9 million due to increased amortization related to the second step of the TechRx acquisition completed in May 2003 and the rollout of new products.

• Income before income taxes and equity in losses of affiliated companies declined to $14.3 million from $20.3 million, due to the decline in Operating income and the increase in Other expense related to a $3.9 million increase in interest expense resulting from our refinancing in the second quarter of last year. The full impact of the increased interest expense is reflected in all quarters beginning with the third quarter of last fiscal year, so year-over-year comparisons of interest expense will be comparable going forward.

• Net income, which was impacted by the above factors, was $8.7 million or $0.25 per diluted share, including a $0.04 per share after-tax restructuring charge related primarily to our organizational streamlining. This compares to $12.7 million or $0.36 per diluted share in the second quarter of fiscal 2003.

32. The 10-Q included Certifications from the defendants pursuant to the Sarbanes-Oxley act, which certified that both defendants had reviewed the financial report and that based on their knowledge, the report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to

make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." The certifications also assured investors that based on their knowledge, "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report" and that NDC had adequate internal and financial controls.

## The Truth Is Revealed

33.     On April 1, 2004, before the market opened, defendants shocked the market by announcing material revenue recognition issues. The press release stated:

> NDC today announced that it will delay release of its 2004 fiscal third quarter financial results and the conference call previously scheduled for April 1 and April 2, 2004, respectively. This decision was prompted by the company's initiation of a review concerning practices and procedures relating to the timing of revenue recognition of sales to the value-added reseller channel in its physician business unit. The physician systems business historically has constituted approximately 8% of the company's total revenue and 6.5% of its total operating income. NDCHealth will release its results as soon as its review is completed.

34.     In response to the Company's news, NDC's stock price dropped nearly 20% on unusually high volumes of almost 4.8 million shares.

17

## Defendants' Class Period Statements Were Materially False and Misleading

35.    The press releases detailing "record" financial results and the SEC filings detailed above were, materially false and misleading because of defendants' fraudulent revenue recognition practices.  Defendants were required to cause the Company to disclose, in its periodic filings with the SEC, financial statements, and news releases the existence of the material facts described herein and to appropriately recognize and report expenses in conformity with GAAP. Defendants failed to cause the Company to make such disclosures and to account for and to report expenses in conformity with GAAP.

36.    Due to the non-disclosures and non-GAAP accounting, the above particularized documents which defendants caused the Company to disseminate to the investing public during the Class Period were materially (as described in SEC Staff Accounting Bulletin No. 99) false and misleading.

37.    Defendants knew and ignored, or were reckless in not knowing, the facts which indicated that the above particularized press releases, public statements, and filings with the SEC which were disseminated to the investing public during the Class Period, were materially false and misleading for the reasons set forth above.

38.    SEC Regulation S-X requires that financial statements filed with the SEC conform with GAAP.  Financial statements filed with the SEC which are not prepared in conformity with GAAP are presumed to be misleading or inaccurate. [17 C.F.R. §210.401 (a)(1)].  The Company's financial statements which were disseminated to the investing public during the Class Period, which represented that the Company's financial position and results of operations were in conformity with GAAP, were false and misleading for the reasons alleged herein and because they constituted an extreme departure from GAAP.  Said financial statements violated the following GAAP concepts among others noted above:

(a)    The concept that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Financial Accounting Concepts No. 1).

(b)    The concept that financial reporting should provide information about an enterprise's financial performance during a period (FASB Statement of Financial Accounting Concepts No. 1).

(c)    The concept that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Financial Accounting Concepts No. 2).

(d)    The concept of completeness, which means that nothing material is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (FASB Statement of Financial Accounting Concepts No. 2).

(e)    The concept that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Financial Accounting Concepts No. 2).

(f)    The concept that the quality of reliability and, in particular, of representational faithfulness leaves no room for ac count ing representations that subordinate substance to form (FASB Statement Of Financial Accounting Concepts No. 2).

39.    Each and every Form 10-Q which defendants caused to be filed with the SEC during the Class Period contained a substantially identical representation which stated: "The accompanying unaudited Condensed Consolidated Financial Statements have been prepared in accordance with generally accepted accounting principles for interim financial information and with the instructions to Form 10 Q and Article 10 of Regulation S X. . .In the opinion of management, all adjustments (consisting of normal recurring accruals) considered necessary for a fair presentation have been included."

40.    For the reasons set forth above, the financial statements which were contained within each and every Form 10-Q which defendants caused to be filed with the SEC during the Class Period did not fairly present (AICPA Profession al Standards Volume 1, U.S. Auditing Standards, Section 411) the Company's results of operations and financial position in conformity with generally accepted accounting principles because:

a.    The accounting principles selected and applied did not have general acceptance.

b.    The accounting principles were not appropriate in the circumstances.

c.    The financial statements, including the related notes, were not informative of matters that affected their use, understanding, and interpretation.

d.    The financial statements did not reflect the underlying events and transactions in a manner that presented the financial position and the result of operations within a range of acceptable limits that were reasonable and practicable to attain in financial statements.

## UNDISCLOSED ADVERSE INFORMATION

41.    The market for NDC common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, NDC common stock traded at artificially inflated prices during the Class Period.  The artificial inflation continued until the time NDC admitted that it was experiencing declining sales and these admissions were communicated to, and/or digested by, the common stock markets.  Plaintiff and other members of the Class purchased or otherwise acquired NDC common stock relying upon the integrity of the market price of NDC common stock and market information relating to NDC, and have been damaged thereby.

42.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of NDC securities, by publicly issuing false and

misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations.

43. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about NDC's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of NDC and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## SCIENTER ALLEGATIONS

44.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements, issued or disseminated by or in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal common stock laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding NDC and its business practices, their control over and/or receipt of NDC's allegedly materially misleading misstatements and/or their associations with the Company, which made them privy to confidential proprietary information concerning NDC, were active and culpable participants in the fraudulent scheme alleged herein.  Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

45. The Individual Defendants engaged in such a scheme to inflate the price of NDC common stock in order to: (i) protect and enhance their executive positions and the substantial compensation and prestige they obtained thereby; (ii) enhance the value of their personal holdings of NDC common stock, including restricted stock.

## STATUTORY SAFE HARBOR

46. The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Further, none of the statements pleaded herein which were forward-looking statements were identified as "forward-looking statements" when made. Nor was it stated that actual results "could differ materially from those projected." Nor were the forward-looking statements pleaded accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from the statements made therein. Defendants are liable for the forward-looking statements pleaded because, at the time each of those forward-looking statements was made, the speaker knew the forward-looking statement was false and the forward-looking statement was authorized and/or approved by an executive officer of NDC who knew that those statements were false when made.

24

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

47. At all relevant times, the market for NDC common stock were was an efficient market for the following reasons, among others:

(a) NDC common stock met the requirements for listing, and was listed and actively traded, on the NYSE, a highly efficient market;

(b) As a regulated issuer, NDC filed periodic public reports with the SEC and the NASD;

(c) NDC stock was followed by common stock analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and

(d) NDC regularly issued press releases which were carried by national newswires. Each of these releases was publicly available and entered the public marketplace.

48. As a result, the market for NDC common stock promptly digested current information with respect to NDC from all publicly-available sources and reflected such information in NDC's stock price. Under these circumstances, all purchasers of NDC common stock during the Class Period suffered similar injury

through their purchase of stock at artificially inflated prices and a presumption of reliance applies.

## COUNT I
### For Violations Of Section 10(b) Of The 1934 Act And Rule 10b-5 Promulgated Thereunder Against All Defendants

49.    Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein. This claim is asserted against all defendants.

50.    During the Class Period, NDC and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of NDC securities; and (iii) cause plaintiff and other members of the Class to purchase NDC common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants NDC and the Individual Defendants, and each of them, took the actions set forth herein.

51.    These defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon

26

the purchasers of the Company's common stock in an effort to maintain artificially high market prices for NDC common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. These defendants are sued as primary participants in the wrongful and illegal conduct charged herein. The Individual Defendants are also sued herein as controlling persons of NDC, as alleged below.

52. In addition to the duties of full disclosure imposed on defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation SX (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly traded common stock would be based on truthful, complete and accurate information.

53. NDC and the Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business

27

practices, performance, operations and future prospects of NDC as specified herein. These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of NDC's value and performance and substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about NDC and its business, operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of NDC common stock during the Class Period.

54.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) the

28

Individual Defendants enjoyed significant personal contact and familiarity with each other and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

55.    These defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing NDC's operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by their overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such

29

knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

56.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of NDC' common stock was artificially inflated during the Class Period. In ignorance of the fact that the market price of NDC's shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the common stock trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired NDC common stock during the Class Period at artificially inflated high prices and were damaged thereby.

57.    At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of NDC, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their NDC common stock

during the Class Period, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

58. By virtue of the foregoing, NDC and the Individual Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

59. As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## COUNT II
### For Violations Of Section 20(a) Of The
### 1934 Act Against Individual Defendants

60. Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein. This claim is asserted against the Individual Defendants.

61. The Individual Defendants were and acted as controlling persons of NDC within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the

31

decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading. Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

62.    In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the common stock violations as alleged herein, and exercised the same.

63.    As set forth above, NDC and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their controlling positions, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## BASIS OF ALLEGATIONS

64.     This complaint is pleaded in conformance with Federal Rules of Civil Procedure and the PSLRA.  Plaintiff has alleged the foregoing based upon the investigation of plaintiff's counsel, which included a review of NDC's SEC filings, common stock analysts' reports and advisories about the Company, press releases issued by the Company and media reports about the Company.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on his own behalf and on behalf of the Class, prays for judgment as follows:

(i)     Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

(ii)     Awarding plaintiff and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

(iii)     Awarding plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

(iv)     Such other relief as this Court deems appropriate.

33

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: April 7, 2004

CHITWOOD & HARLEY LLP

_____

Martin D. Chitwood
Georgia Bar No. 124950
David A. Bain
Georgia Bar No. 032449
2300 Promenade II
1230 Peachtree Street, N.E.
Atlanta, GA  30309
Tel: (404) 873-3900
Fax: (404) 876-4476

**MILBERG WEISS BERSHAD
HYNES & LERACH, LLP**
Maya Saxena
Joseph E. White, III
5355 Town Center Road, Suite 900
Boca Raton, FL 33486
Tel: (561) 361-5000
Fax: (561) 367-8400
            -and-
Steven G. Schulman
Andrei Rado
One Pennsylvania Plaza
New York, NY 10119
Tel: (212) 594-5300
Fax: (212) 868-1229

**THE BRUALDI LAW FIRM**
Richard Brualdi
29 Broadway, Suite 1515

New York, NY 10006
Tel: (212) 952-0602
Fax: (212) 952-0608

**Attorneys for Plaintiff**

35

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF
### PURSUANT TO FEDERAL SECURITIES LAWS

I, Robert Garfield, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1. I have reviewed the NDCHealth Corp (NDC) complaint prepared by The Brualdi Law Firm and Milberg Weiss Bershad Hynes & Lerach LLP, whom I designate as my counsel in this action for all purposes.

2. I did not acquire NDCHealth Corp (NDC) stock at the direction of plaintiff's counsel or in order to participate in any private action under the federal securities laws.

3. I am willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

4. I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the court pursuant to law.

5. I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

6. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is unaffected by my decision to serve as a representative party.

7. During the Class Period I have made the following transactions in NDCHealth Corp (NDC) and will provide records of those transactions upon request:

| No. of Shares | Buy/Sell | Date | Price Per Share |
|---|---|---|---|
| 100 | Buy | 11/7/03 | $26.34 |
| | | | |
| | | | |
| | | | |
| | | | |

Please use and attach additional pages if necessary.

I declare under penalty of perjury that the foregoing is true and correct

Executed this 5th day of April, 2004

Signature

AO 440 (Rev. 10/93) Summons in a Civil Action

# United States District Court

## NORTHERN DISTRICT OF GEORGIA

ROBERT GARFIELD, Individually and
behalf of all others similarly situated,

Plaintiff,

v.

NDCHEALTH CORPORATION,
WALTER M. HOFF, and
RANDOLPH L.M. HUTTO,

Defendants.

**SUMMONS IN A CIVIL CASE**

CASE NUMBER: **1:04 CV 0970**

TO:    Randolph L.M. Hutto
       NDCHealth Corporation
       c/o CT Corporation
       1201 Peachtree St. NE
       Atlanta, GA 30361

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Martin D. Chitwood
CHITWOOD & HARLEY
1230 Peachtree Street, Suite 2300
Atlanta, GA 30309
(404) 873-3900

an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

**LUTHER D. THOMAS**                          **APR - 7 2004**
_____              _____
CLERK                                        DATE

*J. Pinckney*
_____
(BY) DEPUTY CLERK

AO 440 (Rev. 10/93 Summons in a Civil Action

| RETURN OF SERVICE | |
|---|---|
| Service of the Summons and Complaint was made by me[1] | DATE |
| NAME OF SERVER (*PRINT*) | TITLE |

*Check one box below to indicate appropriate method of service*

☐     Served personally upon the defendant.  Place where served:

_____

_____

☐     Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.  Name of person with whom the summons and complaint were left:_____

_____

☐     Returned unexecuted:_____

_____

_____

_____

☐     Other (*specify*):_____

_____

_____

_____

| STATEMENT OF SERVICE FEES | | |
|---|---|---|
| TRAVEL | SERVICES | TOTAL |

| DECLARATION OF SERVER |
|---|

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____          _____
                            Date                                      Signature of Server

                                                        _____
                                                        Address of Server

AO 440 (Rev. 10/93) Summons in a Civil Action

# United States District Court

## NORTHERN DISTRICT OF GEORGIA

ROBERT GARFIELD, Individually and
behalf of all others similarly situated,

Plaintiff,

v.

NDCHEALTH CORPORATION,
WALTER M. HOFF, and
RANDOLPH L.M. HUTTO,

Defendants.

**SUMMONS IN A CIVIL CASE**

CASE NUMBER: **1**:04 CV 0970

TO:    Walter M. Hoff
NDCHealth Corporation
c/o CT Corporation
1201 Peachtree St. NE
Atlanta, GA 30361

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Martin D. Chitwood
CHITWOOD & HARLEY
1230 Peachtree Street, Suite 2300
Atlanta, GA 30309
(404) 873-3900

an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

**LUTHER D. THOMAS**

**APR - 7 2004**

CLERK

DATE

J. Pinckney

(BY) DEPUTY CLERK

AO 440 (Rev. 10/93 Summons in a Civil Action

| RETURN OF SERVICE | |
|---|---|
| Service of the Summons and Complaint was made by me[1] | DATE |
| NAME OF SERVER (*PRINT*) | TITLE |

*Check one box below to indicate appropriate method of service*

☐    Served personally upon the defendant.  Place where served:

_____

_____

☐    Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.  Name of person with whom the summons and complaint were left:_____

_____

☐    Returned unexecuted:_____

_____

_____

_____

☐    Other (*specify*):_____

_____

_____

_____

| STATEMENT OF SERVICE FEES | | |
|---|---|---|
| TRAVEL | SERVICES | TOTAL |

| DECLARATION OF SERVER |
|---|

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____    _____
                        Date                                        Signature of Server

                                                    _____
                                                    Address of Server

AO 440 (Rev. 10/93) Summons in a Civil Action

# United States District Court

## NORTHERN DISTRICT OF GEORGIA

ROBERT GARFIELD, Individually and behalf of all others similarly situated,

Plaintiff,

v.

NDCHEALTH CORPORATION,
WALTER M. HOFF, and
RANDOLPH L.M. HUTTO,

Defendants.

**SUMMONS IN A CIVIL CASE**

CASE NUMBER: **1:04  CV  0970**

TO:    NDCHealth Corporation
       c/o CT Corporation
       1201 Peachtree St. NE
       Atlanta, GA 30361

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Martin D. Chitwood
CHITWOOD & HARLEY
1230 Peachtree Street, Suite 2300
Atlanta, GA 30309
(404) 873-3900

an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

**LUTHER D. THOMAS**                                      **APR - 7 2004**

CLERK                                                     DATE

_J. Puckney_
(BY) DEPUTY CLERK

AO 440 (Rev. 10/93 Summons in a Civil Action

## RETURN OF SERVICE

| Service of the Summons and Complaint was made by me[1] | DATE |
| --- | --- |

| NAME OF SERVER (*PRINT*) | TITLE |
| --- | --- |

*Check one box below to indicate appropriate method of service*

☐     Served personally upon the defendant.  Place where served:

_____

_____

☐     Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.  Name of person with whom the summons and complaint were left:_____

_____

☐     Returned unexecuted:_____

_____

_____

_____

☐     Other (*specify*):_____

_____

_____

_____

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
| --- | --- | --- |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____        _____
              Date                                     Signature of Server

                                                      _____

                                                      Address of Server