# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| IN RE NDCHEALTH CORP., INC. SECURITIES LITIGATION | 1:04-cv-0970-WSD |

## ORDER

This matter is before the Court on Defendants NDCHealth Corporation, Walter M. Hoff, Randolph L. M. Hutto, Charles W. Miller, David H. Shenk, James W. FitzGibbons and Lee Adrean's (collectively the "NDC Defendants") Motion to Dismiss the Second Amended Complaint and Memorandum of Law in Support Thereof [26], Plaintiff's Memorandum of Law in Opposition to NDC Defendants' Motion to Dismiss [31], NDC Defendants' Reply Memorandum in Further Support of their Motion to Dismiss the Second Amended Complaint [36],[1]  Defendant

---

[1]  Also before the Court are Plaintiff's Motion for Leave to File Sur-Reply Brief in Response to NDC Defendants' Motion to Dismiss, or in the Alternative, Motion for Judicial Notice [39], NDC Defendants' Response to Lead Plaintiff's Motion for Leave to File Sur-Reply Brief or, in the Alternative, Motion for Judicial Notice [40], NDC Defendant's Motion to File a Supplemental Notice Relating to the NDC Defendants' Motion to Dismiss [29], NDC Defendant's Second Supplemental Notice Relating to NDC Defendants' Motion to Dismiss [41], Plaintiff's Motion for Judicial Notice of Supplemental Filings [42], Plaintiff's

Ernst & Young's Motion to Dismiss Plaintiffs' Second Amended Complaint [25], Plaintiff's Memorandum of Law in Opposition to Ernst &Young's Motion to Dismiss [32], and Defendant Ernst &Young's Reply Memorandum in Support of its Motion to Dismiss [35].

## I.    BACKGROUND

This is a federal securities class action brought against NDCHealth Corporation ("NDC" or the "Company"), specific officers of NDC, and NDC's independent auditor Ernst & Young, LLP ("E&Y").  Plaintiff asserts claims under the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j, alleging that NDC, E&Y, and the individual defendants knew about or recklessly disregarded practices that the Company engaged in during the Class Period that artificially affected the value of NDC's stock.  Plaintiff first filed a complaint on April 7, 2004 [1].  On August 9, 2004, Plaintiff filed its Amended Consolidated Class Action Complaint for Violations of the Securities Exchange Act of 1934 [9].

---

Motion for Judicial Notice of Supplemental Filings [43], NDC Defendants' Response to Lead Plaintiff's Motions for Judicial Notice of Supplemental Filings [44], NDC Defendant's Third Supplemental Notice [46], NDC Defendants' Fourth Supplemental Notice [48] and Motion of E&Y to Supplement Motion to Dismiss [49].

On September 1, 2004, Plaintiff filed its Second Amended Consolidated Class Action Complaint for Violations of the Securities Exchange Act of 1934 (hereafter the "Complaint") [16].

A.    Parties

Lead Plaintiff DeKalb County Pension Fund ("Plaintiff") brings these claims on behalf of a putative class of persons who purchased NDC common stock between August 21, 2002, and August 9, 2004 (the "Class Period").  (Compl. ¶ 1.)

Defendant NDC is a provider of health information services for pharmacy, hospital, physician, pharmaceutical and payer businesses.  (Id. ¶ 16.)  NDC's products and services include electronic healthcare claims transactions, healthcare claims editing services, medical management systems, electronic prescription connections, legal compliance management applications, pharmaceutical market data and analysis, and healthcare industry research and analysis.  (Id. ¶ 16.)  NDC sells its medical practice software to physicians and other medical practices through independently contracted Value Added Resellers ("VARs").  (Id. ¶¶ 16, 36.)  VARs purchase the Company's products for resale to others or as incorporated with other products or services.

Defendant Walter M. Hoff ("Hoff") was at all relevant times NDC's Chief Executive Officer and President.  (Id. ¶ 17.)  Defendant Randolph L. M. Hutto ("Hutto") was NDC's Chief Financial Officer until April 2004 when he was replaced by Defendant Lee Adrean ("Adrean"), when Adrean joined the Company.  (Id. ¶ 18.)  Defendant Adrean has served as NDC's Chief Financial Officer since April 22, 2004.  (Id. ¶ 22.)  Defendant Charles W. Miller ("Miller") was at all relevant times NDC's President and Chief Operating Officer.  (Id. ¶ 19.)  Defendant David H. Shenk ("Shenk") was NDC's Vice President and Corporate Controller, prior to the Class Period until January 2004.  (Id. ¶ 20.)  Defendant Shenk, Plaintiff alleges, received proceeds in excess of $198,000 from his sale of NDC stock on February 2, 2004.  (Id. ¶ 171.)  Defendant James W. FitzGibbons ("FitzGibbons") replaced Shenk and has served as Vice President of Finance and Chief Accounting Officer since January 2004 when he joined the Company.  (Id. ¶ 21.)  Plaintiff refers to Defendants Hoff, Hutto, Miller, Shenk, FitzGibbons, and Adrean collectively as the "Individual Defendants."  (Id. ¶ 23.)

Defendant E&Y is a major accounting firm that has served as NDC's independent auditor since the close of fiscal year 2002.  (Id. ¶ 24.)  E&Y issued audit opinions on the Company's 2003 and 2004 financial statements.  (Id.)

-4-

B.      Plaintiff's Allegations

Plaintiff claims Defendants "engaged in a variety of undisclosed accounting

manipulations and business practices which caused the Company's financial results

to be materially overstated."  (Compl. ¶ 2.)  Defendants' improper practices,

Plaintiff alleges, violated the Company's policies and violated Generally Accepted

Accounting Principles ("GAAP").[2]  (Id. ¶ 2.)  Plaintiff bases its allegations against

E&Y on E&Y's audit opinions that failed to detect or correct NDC's alleged

misconduct.  Plaintiff alleges three categories of misconduct by the NDC

Defendants.

1.      *Improper Revenue Recognition*

Plaintiff claims NDC "engaged in a pattern of premature, improper revenue

recognition that had the effect of materially inflating the Company's reported

earnings, revenues and accounts receivable, thereby rendering NDC's financial

reporting throughout the Class Period materially false and misleading."  (Pl.'s

Opp'n to NDC Defs.' Mot. to Dismiss ("Pl.'s Opp'n") at 18.)  Plaintiff asserts the

---

[2] GAAP "are the conventions, rules and procedures that constitute the
professional standards of the accounting profession."  In re Miller Indus., Inc. Sec.
Litig., 12 F. Supp. 2d 1323, 1328 (N.D. Ga. 1998).

improper revenue recognition occurred as a result of three allegedly interrelated practices: (1) granting exchange and return rights to VARs, which allowed VARs to return products they could not sell; (2) providing incentives, discounts and credit terms that facilitated "channel stuffing,"[3] which increased the risk of non-payment and the risk NDC's accounts receivable could not be collected; and (3) granting advertising allowances to VARs, but failing to require VARs to use the allowances for advertising, which failed to produce identifiable benefits to permit the allowance to be booked as revenue. (Id. at 18-19.)

            a.      Returns

Plaintiff alleges NDC permitted VARs to exchange prior versions of a product for the latest version of the product, but failed to disclose this policy in statements regarding NDC's revenue recognition policy rendering reports of revenue misleading. (Compl. ¶ 38.) NDC stated, in its August 30, 2002 Form 10-Q, that "we recognize [software] revenue when persuasive evidence of an agreement exists, delivery and performance has occurred, there is a fixed and

---

[3] The term "channel stuffing" is used in a variety of ways. Here, Plaintiff alleges it as a practice whereby customers are induced through incentives and discounts to purchase excessive amounts of product in an earlier reporting period to improve sales for the earlier period at the expense of sales in later periods.

determinable sales price, and collectability is reasonably assured." (Id. ¶ 39.)

NDC further stated that recognition of revenues from sales of software, which is

customer installed, to VARs is recognized when the product is shipped. (Id.)

Plaintiff claims NDC's exchange or return policy resulted in "the risk of the VAR

not selling the product in this situation [being] retained by NDC . . . ." (Pl.'s

Opp'n at 19; Compl. ¶¶ 38-39.) Plaintiff argues NDC should not have recognized

revenue on these transactions.[4]

### b.    Accelerated purchases

Plaintiff also alleges NDC's sales practices were misleading because they

concealed that currently reported sales are generated at the expense of sales in

future periods. (Compl. ¶ 41.) Plaintiff claims VARs were given deep discounts,

flexible payment terms, and other incentives to purchase excess inventory, and this

practice, particularly when combined with improper rights of exchange and return,

---

[4] Plaintiff claims this impropriety is corroborated by NDC's October 28, 2004 disclosure that its presently reported financial statements may be impacted by the identification of certain practices regarding the exchange of physician software inventory held by VARs "that were inconsistent with company policies dealing with such exchanges . . . ." (Pl.'s Opp'n at 19-20; Def.'s Notice of Filing [33], Ex. A.) The Court has taken notice of the Supplemental Notices filed by the parties. (See Supplemental Notices [33, 41, 42, 43, 44, 46].

resulted in improper recognition of revenue. (Compl. ¶¶ 41-55.) Plaintiff asserts a former executive claims the incentive programs were created to accelerate sales to meet sales quotas for reporting purposes, alleging further that senior management in the division were involved in the creation of the incentive programs. (Id. ¶ 44.) Plaintiff alleges a former employee claims senior management was aware of the increase in accounts receivable resulting from the alleged "channel stuffing." (Id. ¶ 56.)[5]

### c.    "Uplifting"

Plaintiff also claims NDC inflated revenue by using "uplift." (Compl. ¶ 58.) This practice purportedly involved giving VARs a deep discount in the form of an allowance to be spent on advertising NDC's products. By not requiring the VAR to spend the allowance on advertising, Plaintiff alleges the Company did not receive

---

[5] Plaintiff also contends "An analysis of NDC's reserve for doubtful accounts and related charge-offs and recoveries for fiscal year 2003 and fiscal year 2004 reveals a pattern strongly suggesting that Defendants concealed overstated revenues for fiscal year 2003 and 2004 by increasing NDC's provision in the fourth quarter of both years and taking a very large, anomalous charge for uncollectible accounts receivable." (Compl. ¶ 67.) Plaintiff claims these results are "highly irregular," (id. at 68), and support Plaintiff's claim that "channel stuffing" resulted in uncollectible receivables which resulted in NDC's reporting of earnings, revenues and accounts receivable to be false and misleading.

the benefits required to book the discounts as revenue.  (Id.)  This practice,

Plaintiff claims, contradicts the Company's SEC filings in which NDC stated it

complied with accounting regulations that "require[] that the vendor receive an

identifiable benefit from the discount in order to book the discount as

revenue . . . ."  (Id.)

Plaintiff claims these three interrelated practices violated GAAP and "had the

effect of materially inflating the Company's reported earnings, revenues and

accounts receivable, thereby rendering NDC's financial reporting throughout the

Class Period materially false and misleading."  (Compl. ¶ 40.)

> 2.     *Failure To Write Down Investment In MedUnite In Timely Manner*

NDC was a stakeholder in MedUnite, which was a joint venture created by

NDC and seven other health insurers.  (Compl. ¶ 69.)  NDC's investment in

MedUnite is alleged to have been valued at $53.2 million on August 19, 2002.  (Id.)

NDC received its interest in MedUnite as consideration for an NDC transaction

processing platform, which was the key asset in MedUnite's business model.  (Id.

¶ 70.)  Plaintiff alleges the NDC asset was performing poorly at the time it was

provided to MedUnite.  (Id.)

Plaintiff alleges that on September 23, 2002, two of MedUnite's co-founders -- Pacificare and Oxford Health -- wrote down to zero the $11 million each had invested in the MedUnite venture.  (Id. ¶ 71; Pl.'s Opp'n at 22.)  Plaintiff does not allege that the five other founders of MedUnite wrote down their interests in MedUnite in a similar fashion.  Plaintiff alleges NDC disclosed in its Form 10-K for fiscal year 2002, filed with the SEC on August 28, 2002, the following about  its MedUnite investment:

> . . . [T]he Company has determined that the value of MedUnite has declined, and that such decline is not temporary.  Therefore, for the year ended May 31, 2002, . . . the Company recorded a non-cash charge reducing the carrying value of the investment in MedUnite to $12.2 million. . . .

(Compl. ¶ 72.)

On December 31, 2002, ProxyMed, Inc., acquired all outstanding shares of MedUnite "for $10 million in cash and an aggregate $13,400,000 principal amount of 4% Convertible Promissory Notes."  (Compl. ¶ 73.)  NDC issued a January 2, 2003 press release, titled "NDCHealth ANNOUNCES IMPACT OF SALE OF MEDUNITE," disclosing the following with regard to the sale of MedUnite:

> . . . [I]n conjunction with the sale of MedUnite, [NDC] will take a non-cash charge that will be reflected in its

> financial statements for the current quarter ending
> February 28, 2003 to reduce the carrying value of its
> investment in MedUnite to the amount realized in the sale.
> As of November 29, 2002 [NDC's] investment in
> MedUnite had a carrying value of $12.2 million.

(Compl. ¶ 74.)  On March 19, 2003, NDC disclosed its disposition of its interest in

MedUnite forced the Company to take a charge of $11.6 million against the

previously reported carrying value of $12.2 million.  (Id. ¶¶ 4, 75.)  Plaintiff

contends the press releases were highly misleading and were the result of

Defendants' attempt to hide the true value of the investment.  Plaintiff claims the

January 2, 2003 press release was misleading because "it gave the distinct

impression that the charge would be *de minimis*."  (Pl.'s Opp'n at 25.).

### 3.    *Improper Capitalization And Amortization Of Software Development Costs*

Plaintiff alleges NDC capitalized and amortized costs associated with

software development improperly.  (Compl. ¶ 76.)  Plaintiff claims the Company

capitalized costs at a very early stage in the product's development, before

technological feasibility, and amortized the capitalized costs of software

development over a three to five year period even though the software allegedly

generated revenue for only one year.  (Id. ¶¶ 76-77.)  Plaintiff also alleges NDC

-11-

applied an inappropriate and excessive "burden factor" to the amounts it capitalizes.  (Id. ¶ 77.)  Plaintiff claims a typical burden factor is between 20-40%, but NDC would apply a burden factor sometimes as high as 75-80%.  (Id. ¶ 77.)[6] Plaintiff asserts "These practices result in artificially lowering expenses in a given reporting period, thereby materially inflating earnings," and also violated GAAP. (Id.)[7]

> C.      Alleged Violations Of Securities Laws

Plaintiff asserts two counts based on the alleged misconduct of the NDC Defendants and E&Y.  In Count I, Plaintiff seeks damages under Section 10(b) of the Exchange Act and Rule 10(b)(5) of the Securities Exchange Commission. Count I is asserted against all Defendants for various alleged false and misleading statements.  In Count II, Plaintiff seeks damages against the Individual Defendants under Section 20(a) of the Exchange Act on the grounds they are "control persons" of NDC and thus liable for the alleged violations of Count I.

---

[6] Plaintiff alleges these practices are detailed in a document that is circulated among upper-level management.  (Id. ¶ 82.)

[7] Plaintiff alleges an unidentified former executive estimated "roughly" $30-60 million of the capitalized costs on NDC's most recent financial statements should have been expensed in prior periods.  (Id. ¶ 77.)

## II.   STANDARD OF REVIEW

### A.   Standard Of Review For Motion To Dismiss

A "complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). On a motion to dismiss, the allegations contained in the complaint must be accepted as true and the facts and all inferences must be construed in the light most favorable to the plaintiffs. See Hawthorne v. Mac Adjustment, Inc., 140 F.3d 1367, 1370 (11th Cir. 1998); Cooper v. Pate, 378 U.S. 546, 546 (1964); Conner v. Tate, 130 F. Supp. 2d 1370, 1373 (N.D. Ga. 2001) (Thrash, J.). However, in all cases, plaintiff must not simply make bare assertions of legal conclusions. "[C]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." Oxford Asset Mgmt., Ltd. v. Jaharis, 297 F.3d 1182, 1188 (11th Cir. 2002).

### B.   Standard Of Review For Federal Securities Fraud Case

#### 1.   *Expanded Evidence Considered*

When considering a motion to dismiss in a securities fraud case, the Court may take judicial notice of the contents of relevant public documents that were

-13-

required to be filed with the Securities Exchange Commission ("SEC") and were actually filed.  See Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1280 (11th Cir. 1999).  The Court may also consider evidence outside the pleadings that is undisputedly authentic and on which plaintiffs specifically relied in the complaint. Harris v. Ivax Corp., 182 F.3d 799, 802 n.2 (11th Cir. 1999).

### 2. *Heightened Pleading Requirements*

To survive a motion to dismiss, allegations of securities fraud must satisfy the requirements of Federal Rule of Civil Procedure 9(b).  Rule 9(b) requires that allegations of fraud be pleaded with particularity.  Rule 9(b)'s requirements apply to claims under Section 10(b) and Rule 10b-5.  See, e.g., In re Towne Servs., Inc. Sec. Litig., 184 F. Supp. 2d 1308, 1316 (N.D. Ga. 2001).  Rule 9(b) requires plaintiffs to plead "such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby . . . .  [C]onclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule."  Parnes v. Gateway 2000, Inc., 122 F.3d 539, 549-50 (8th Cir. 1997) (dismissing complaint because plaintiffs' allegation of fraud "is simply not particularized") (quotation and citation omitted).  Essentially, Rule 9(b) requires

plaintiffs in a securities fraud case to specify the who, what, where, when, why and how of the alleged fraud.  See In re World Access, Inc. Sec. Litig., 119 F. Supp. 2d 1348, 1353 (N.D. Ga. 2000).

In 1995, Congress passed the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4, which reinforces the heightened pleading requirements of Rule 9(b), and imposes additional requirements for plaintiffs in securities fraud cases.  First, the PSLRA requires a plaintiff to specify each statement or omission alleged to be misleading, the reason why the statement or omission is misleading and the facts surrounding the alleged misrepresentation.  15 U.S.C. § 78u-4(b)(1).  Second, to survive a motion to dismiss, the PSLRA requires plaintiff, "with respect to each act or omission . . . [to] state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  If the plaintiff does not satisfy the PSLRA's pleading requirements, then the Court must dismiss the complaint.  See 15 U.S.C. § 78u-4(b)(3)(A).  "Essentially, a private securities plaintiff proceeding under the PSLRA must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct."  In re World Access, Inc. Sec. Litig., 119 F. Supp. 2d at 1353.

Case 1:04-cv-00970-WSD   Document 50   Filed 07/27/05   Page 16 of 54

These heightened pleading requirements under the PSLRA serve important ends: "In securities fraud suits, this heightened pleading standard provides defendants with fair notice of the plaintiffs' claims, protects defendants from harm to their reputation and goodwill, reduces the number of strike suits, and prevents plaintiffs from filing baseless claims and then attempting to discover unknown wrongs." Tuchman v. DSC Commc'ns Corp., 14 F.3d 1061, 1067 (5th Cir. 1994).

C.     Elements Of Plaintiff's Claims

Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, makes it unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security[,] . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe . . . ." 15 U.S.C. § 78j(b).  Rule 10b-5 of the Securities Exchange Commission, promulgated under Section 10(b) of the Exchange Act, makes it unlawful:

> (a) To employ any device, scheme or artifice to defraud, (b) To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5 (1995).  To state a securities fraud claim under Rule 10b-5, the Eleventh Circuit has held a plaintiff must demonstrate (1) a misstatement or omission, (2) of a material fact, (3) made with scienter or intent to defraud, (4) in connection with the sale of securities, (5) upon which plaintiff relied, and (6) that proximately caused plaintiff's injury.  Bryant, 187 F.3d at 1281.  The Eleventh Circuit has found that to satisfy the scienter requirement, "a securities fraud plaintiff must plead scienter with particular facts that give rise to a strong inference that the defendant acted in a severely reckless manner." Id. at 1287.  "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." Theoharous v. Fong, 256 F.3d 1219, 1225 (11th Cir. 2001) (quotations and citations omitted).

Section 20(a) provides liability for a "controlling person" where an Exchange Act violation is found.  15 U.S.C. § 78t(a).  To successfully allege control person liability under Section 20(a), plaintiff must allege that (1) the company violated Section 10(a), (2) the defendant had the power to control the general affairs of the

company, and (3) the defendant had the power to control the specific corporate policy that resulted in the primary violation.  See Theoharous, 256 F.3d at 1227.  A defendant is not liable as a control person under Section 20(a) unless a primary violation of the securities laws is proved.  Id.

## III.    DISCUSSION

### A.    NDC Defendants' Motion to Dismiss

The NDC Defendants move to dismiss Plaintiff's Complaint on five grounds.  First, the NDC Defendants claim Plaintiff has failed to allege with requisite specificity that Defendants made false and misleading statements. Second, the NDC Defendants contend Plaintiff's claims fail because Plaintiff has not pleaded sufficient facts to give rise to a strong inference of scienter as required by the PSLRA.  Third, the NDC Defendants contend Plaintiff does not have standing to pursue its claim regarding the write down of NDC's MedUnite investment.  Fourth, the NDC Defendants contend Plaintiff fails to plead loss causation with regard to its claim of improper capitalization and amortization of software development costs.  Fifth, the NDC Defendants contend Plaintiff's control person claim under Section 20 of the Exchange Act fails because Plaintiff failed to establish a primary violation of the securities laws.

The Court considers first the principal issue on which Plaintiff's pleadings fail and because of which this action is required to be dismissed.

      1.    *Scienter*

To state a claim for securities fraud under the Exchange Act, a plaintiff must prove scienter, or an intent to defraud. The PSLRA requires a securities fraud complaint, "with respect to each act or omission alleged to violate this chapter, [to] state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "[T]hose facts must now present a *strong* inference of scienter. A mere reasonable inference is insufficient to survive a motion to dismiss." Greebel v. FTP Software, Inc., 194 F.3d 185, 196 (1st Cir. 1999). Although factual allegations may be aggregated to infer scienter, "scienter must be found with respect to each defendant and with respect to each alleged violation of the statute." See Phillips v. Scientific-Atlanta, Inc., 374 F.3d 1015, 1017-18 (11th Cir. 2004). "[Section] 10(b) was addressed to practices that involve some element of scienter and cannot be read to impose liability for negligent conduct alone." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 201 (1976). The Eleventh Circuit requires that:

> [T]he plaintiff must allege particular facts giving rise to a strong inference that the defendant acted in a severely reckless manner.  Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

Theoharous, 256 F.3d at 1225 (quotations and citations omitted).

"In order to comply with the heightened pleading requirement of the PSLRA, [a] class action complaint must describe how the defendants acted with severe recklessness in relation to the alleged material misrepresentations and omissions." In re Unicapital Corp. Sec. Litig., 149 F. Supp. 2d 1353, 1371 (S.D. Fla. 2001). "Conclusory allegations do not satisfy the pleading requirements of Rule 9(b) . . . ."  In re K-Tel Int'l, Inc. Sec. Litig., 300 F.3d 881, 894 (8th Cir. 2002) (quotation and citation omitted).  A complaint alleging securities fraud "must provide a factual basis for allegations of scienter." Id.  The PSLRA demands specific, particularized pleading.

"[A] showing of mere motive and opportunity is insufficient to plead scienter." Bryant, 187 F.3d at 1287.  GAAP violations, standing alone, are insufficient to create an inference of fraud.  Ziemba v. Cascade Int'l, Inc., 256 F.3d

1194, 1208 (11th Cir. 2001); In re Comshare, Inc. Sec. Litig., 183 F.3d 542, 553

(6th Cir. 1999). The standard that must be met is a significant one:

> In order to plead fraudulent accounting practices with
> particularity, a complaint should show facts that support
> the inference that the defendants recklessly disregarded
> the deviance from GAAP or acted with gross indifference
> to the misrepresentations in its financial statements.
> Relevant facts are the magnitude of the accounting error,
> whether the defendants had prior notice of the error, and
> whether the defendants played any role in calculating and
> disseminating the financial statement.

In re Scientific-Atlanta, Inc. Sec. Litig., 239 F. Supp. 2d 1351, 1366 (N.D. Ga.

2002) (quotation and citation omitted).[8]

Plaintiff does not offer any direct evidence of knowledge by any of the

Individual Defendants of the conduct alleged. For defendants Shenk and

FitzGibbons, Plaintiff provides no discussion of their intent and does not even

mention them in its discussion of the conduct Plaintiff claims gives rise to its

securities fraud claim. For the defendants that are mentioned, the allegations fail

---

[8] "Thus, in certain circumstances, courts have held that allegations of violations of GAAP, coupled with ignoring 'red flags' or warning signs of improprieties, can be sufficient to state a claim of securities fraud." In re Smith Gardner Sec. Litig., 214 F. Supp. 2d 1291, 1302 (S.D. Fla. 2002). Even in these cases, courts require something to show that a defendant was acting with such lack of care that it amounted to severe recklessness.

completely to allege their scienter directly or inferentially.  The allegations of scienter upon which Plaintiff relies do not meet the standard required to avoid a motion to dismiss.  Plaintiff claims the following allegations are indicative of scienter:  (1) Defendants Hoff, Hutto, and Adrean certified the Company's financial disclosures pursuant to the Sarbanes-Oxley Act; (2) the Company twice increased reserves at year end and charged off large amounts of accounts receivable without explanation; (3) the Company determined its substantial backlog of VAR channel inventory as of March 31, 2004; and (4) Defendants Hoff and Miller attended meetings in Arizona at which the problems of the physician services unit allegedly were discussed.  (Pl.'s Opp'n at 39-40.)

Plaintiff also alleges scienter is evidenced by Defendant Shenk's sale of 7,000 shares of NDC stock for $198,100.  (Compl. ¶ 171.)  Plaintiff claims this sale was suspicious and unusual.  (Id.)  Finally, Plaintiff alleges Defendants were motivated to engage in the fraudulent scheme to avoid defaulting on a credit agreement with a group of banks.  (Id. ¶ 172.)

Plaintiff claims Defendants Hoff, Hutto and Adrean certified the Company's financial disclosures pursuant to the Sarbanes-Oxley Act, and this demonstrates scienter.  Plaintiff does not allege, other than in conclusory fashion, that these

defendants were aware of any problems with the Company's financial statements, and does not allege that any of the disclosures should have raised "red flags."[9] Plaintiff's argument essentially is that Defendants must have known the disclosure was incomplete and thus their intentional act of certification is sufficient to infer scienter. Plaintiff must show that the certification was severely reckless. This can only be met if Plaintiff can first assert sufficient facts that directly, or by inference, allege that Defendants knew or should have known that the financials contained highly unreasonable omissions and misrepresentations that were a severe departure from standards of ordinary care and that Defendants, upon certification, either knew or it was so obvious they should have known that the alleged omissions or misrepresentations presented a clear danger of misleading buyers or sellers. To the

_____

[9] Sarbanes-Oxley now requires the Chief Financial Officer and Chief Executive Offer to certify a public company's financial disclosures. Plaintiff's claim that certification is evidence of scienter is not logical. If the fact of certification were evidence of scienter, a plaintiff could avoid meeting the significant scienter showing required under Rule 9(b) and the PSLRA. Just as GAAP violations, standing alone, are insufficient to create an inference of fraud, see Ziemba, 256 F.3d at 1208, so are certifications, standing alone, insufficient. There are a myriad of reasons why certification may be made of financial statements in which errors are subsequently identified. Congress did not intend certification to substitute for scienter. Plaintiff must plead facts sufficient to show gross indifference to the representations in the financial statements or other severe recklessness. See Theoharous, 256 F.3d at 1224-25.

extent Plaintiff claims the certifications are an "inference" of scienter, this also is

insufficient under the pleading requirements in a securities fraud case.  Plaintiff fails

to explain why these Defendants' certification of financial disclosures pursuant to

federal law leads to an

inference -- let alone the strong inference required by the PSLRA -- that Defendants

acted with scienter.  See Abrams v. Baker Hughes, Inc., 292 F.3d 424, 432 (5th

Cir. 2002) (finding mere publication of accounting figures that violate GAAP

insufficient; "The party must know that it is publishing materially false information,

or must be severely reckless in publishing such information.").  Allegations of

certification of financial statements pursuant to Sarbanes-Oxley do not give rise to

an inference stronger than that which arises from conclusory allegations that

Defendants were cognizant of the Company's accounting procedures and that

these procedures violate GAAP.  In this case, the alleged GAAP violations are not

sufficient alone to establish scienter.  See Ziemba, 256 F.3d at 1210 (finding when

"discretion is necessarily involved," alleged GAAP violations do not establish

scienter).[10]

---

[10] Plaintiff argues "Defendants may not simply disavow knowledge of
fraudulent practices, because 'facts critical to a business's core operations . . .

Plaintiff next claims the fact the Company twice increased its reserves at year end and charged-off huge amounts of its accounts receivable, without explanation, demonstrates scienter.  Again, Plaintiff does not explain how these facts give rise to a strong inference Defendants acted with scienter and these allegations also do not meet the pleading standard required.  Plaintiff claims the reserve increase and charge-off  were "highly irregular," and that the Company acted "without explanation."  This is not a sufficient specific pleading to establish a claim.  See Abrams, 292 F.3d at 433 (finding nature of accounting problems here "can easily arise from negligence, oversight or simple mismanagement, none of which rise to the standard necessary to support a securities fraud action").  Even if the allegations rose to the level of GAAP violations, it is well settled that allegations of GAAP alone are not sufficient to allege scienter.  See Ziemba, 256 F.3d at 1208.  Plaintiff's claim that this was "highly irregular" is not enough to allege scienter

---

generally are so apparent that their knowledge may be attributed to the company and its key officers.'"  (Pl.'s Opp'n at 41 (citing Epstein v. Itron, Inc., 993 F. Supp. 1314, 1326 (E.D. Wash. 1998).)  Plaintiff's argument is not convincing. Plaintiff has not presented any evidence demonstrating Defendants' scienter, and accepting Plaintiff's argument would contravene the express directives of the PSLRA requiring Plaintiff to allege facts sufficient to meet its pleading burden.  See also n.11, *infra*.

because "[c]laims of securities fraud cannot rest on speculation and conclusory allegations." In re Comshare, Inc. Sec. Litig., 183 F.3d at 553 (quotation and citation omitted).

Plaintiff argues NDC's determination of its "tremendous" backlog of VAR inventory as of March 31, 2004, raises an inference of scienter. Plaintiff, however, again fails to indicate how this evidences Defendants' alleged scienter. Plaintiff alleges that after discovering this backlog, "the next day, NDC announced that it would delay its earnings release pending a review of its revenue recognition practices in the Physician Services unit." (Compl. ¶ 63.) It is counter-intuitive that Plaintiff would use this conduct as evidence of scienter when practical evaluation and common sense urges that it evidences the absence, rather than the presence, of fraud. That is, an immediate disclosure to the investing public weighs *against* a finding of scienter. See Cutsforth v. Renschler, 235 F. Supp. 2d 1216, 1261 (M.D. Fla. 2002) (finding disclosures of unfavorable information weighing against an inference of scienter). Although Defendants' discovery may give rise to an inference that the Company was negligent in its accounting, it discredits an inference Defendants acted with the requisite level of scienter. See Abrams, 292 F.3d at 433 (finding nature of accounting problems here "can easily arise from

-26-

negligence, oversight or simple mismanagement, none of which rise to the standard necessary to support a securities fraud action").

Plaintiff next claims Defendants Hoff and Miller's attendance at meetings in Arizona at which problems of the physicians services unit "were discussed in detail," demonstrates scienter.  In its Complaint, Plaintiff claims "At the meetings, which often ran for extended periods (10-12 hours), every aspect of the Physician Services business was discussed in detail, including the aggressive channel stuffing and mounting problems with accounts recevable [sic]."  (Compl. ¶ 56.)  This allegation does not contain "particular facts giving rise to a strong inference that the defendant acted in a severely reckless manner."  Theoharous, 256 F.3d at 1225 (quotations and citations omitted).  As pointed out before, GAAP violations alone are not sufficient to demonstrate scienter.  More is required.   "Plaintiff[] must detail what was discussed at the meeting, by whom, and why such discussion would have alerted [Defendant] to the alleged fraud."  In re Recotron Corp. Sec. Litig., 358 F. Supp. 2d 1130, 1149 (M.D. Fla. 2005) ("The statement that [defendant] 'knew exactly what was going on' is embarrassingly vague and the discussions at quarterly meetings . . . require more specificity."); see also In re Sunterra Corp. Sec. Litig., 199 F. Supp. 2d 1308, 1325 (M.D. Fla. 2002)

("[N]owhere do Plaintiffs allege with the requisite specificity and indicia of reliability that [defendants] were put on notice of the deficient accounting practices and policies."). Bare, unspecific allegations that officers attended meetings at which a segment of the Company's business was discussed cannot, alone, demonstrate scienter. In re Comshare, Inc. Sec. Litig., 183 F.3d at 553 ("[C]laims of securities fraud cannot rest 'on speculation and conclusory allegations.'").[11]

_____

[11] Plaintiff cites Epstein v. Itron, 993 F. Supp. 1314, 1326 (E.D. Wash. 1998), In re Atlas Air Worldwide Holdings, Inc. Sec. Litig., 324 F. Supp. 2d 474, 490 (S.D.N.Y. 2004), In re Towne Services., Inc. Sec. Litig., 184 F. Supp. 2d 1308, 1325 (N.D. Ga. 2001), Cosmas v. Hassett, 886 F.2d 8, 12 (2d Cir. 1989), and In re Clarus Corp. Sec. Litig., 210 F. Supp. 2d 1244, 1251 (N.D. Ga. 2002), for the proposition that knowledge of fraud can be attributed to key officers. (Pl.'s Opp'n at 40-41.) These cases do not apply here. For example, in Epstein, the court found "facts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its key officers." 993 F. Supp. at 1326. In Epstein, Plaintiff claimed the company's core product was technologically incapable of performing as intended which affected the company's "continued survival as a business entity" -- the kind of bright red flag that permitted the Epstein court to infer the sort of severe recklessness required to avoid dismissal in a securities fraud case. Id. See also In re Atlas Air Worldwide Holdings, Inc. Sec. Litig., 324 F. Supp. 2d at 490 (alleging facts that "substantially affect . . . core operations"); In re Towne Servs., Inc. Sec. Litig., 184 F. Supp. 2d at 1325 (involving "serious," "massive" and "extraordinary" occurrences); Cosmas, 886 F.2d at 12 (pre-PSLRA, involving "eliminat[ion of] a potentially significant source of income"); In re Clarus Corp. Sec. Litig., 210 F. Supp. 2d at 1251 (involving "single transaction [which] accounts for in excess of one-third of quarterly revenue"). Plaintiff here challenges accounting judgments which, unlike these cases, do not raise red flags. "Mere allegations that Defendants

Although Plaintiff does not discuss additional allegations of scienter in its response brief, the Court will address Plaintiff's remaining allegations briefly. Plaintiff claims Defendant Shenk was motivated to engage in the alleged fraud to enable him to sell 7,000 shares of NDC stock for proceeds of $198,100. (Compl. ¶ 171.) Plaintiff claims this sale is "suspicious and unusual." (Id.) This allegation is insufficient to rise to an inference of scienter because Plaintiff does not provide any context to support the sale was even unusual. See In re Smith Gardner, 214 F. Supp. 2d at 1304 (finding stock sales not probative of scienter because, *inter alia*, plaintiffs fail to provide trading history for defendant); In re Theragenics Corp. Sec. Litig., 105 F. Supp. 2d 1342, 1361 (N.D. Ga. 2000) (noting there are many reasons for sale of stock and the "Court refuses to simply assume that these sales were the product of fraudulent intent"). That Defendant Shenk is the only individual alleged to have profited from the alleged fraudulent activity, among the six Individual Defendants, also weighs *against* finding scienter. See Druskin v. Answerthink, Inc., 299 F. Supp. 2d 1307, 1336 n.40 (S.D. Fla. 2004); In re Sunterra Corp. Sec. Litig., 199 F. Supp. 2d at 1326. Finally, Plaintiff claims Defendants were motivated

held senior management positions . . . is insufficient to plead scienter." In re Smith Gardner Sec. Litig., 214 F. Supp. 2d at 1303.

to engage in fraud to avoid defaulting on certain covenants contained in a credit

agreement with a group of banks.  (Compl. ¶ 172.)  Plaintiff's allegation is

unsupported, conclusory, and clearly insufficient as a basis to infer or even suggest

scienter.  See generally Cutsforth, 235 F. Supp. 2d at 1250 ("It would virtually

always be true that a company would derive some economic benefit from a higher

stock price.  Consequently, an allegation of a motive similar to the one asserted

here has been rejected as insufficient.")

Viewing Plaintiff's allegations individually, in the aggregate and in the light

most favorable to Plaintiff, the Court finds Plaintiff has failed to allege particular

facts giving rise to a strong inference that any Defendant acted in a severely

reckless manner.[12]  Having failed to allege the necessary scienter element, Plaintiff's

claims against the Individual Defendants and NDC must be dismissed.[13]

---

[12]  That Plaintiff's pleading on scienter is insufficient is evidenced in its
response to Defendants' persuasive argument that the allegations in the Complaint
fall short of the particularized pleading required to avoid dismissal on the scienter
element.  After reiterating the standard in the Eleventh Circuit for pleading this
required element, Plaintiff's particularized factual allegations purporting to raise a
strong inference of scienter are set forth in a mere three paragraphs on two pages of
its forty-seven page brief filed in opposition to the NDC Defendants' Motion to
Dismiss.  (Pl.'s Opp'n at 39-41.)

[13]  Because the allegations of scienter for each of the Defendants is
insufficient, the claims against NDC necessarily are insufficient.

2.      *Adequacy Of Alleged False And Misleading Statements*

The PSLRA requires Plaintiff to identify the specific statements or omissions alleged to be misleading, articulate the reasons why each statement or omission was misleading, and identify the time, place and context of each allegedly misleading statement.  See In re World Access, Inc. Sec. Litig., 119 F. Supp. 2d at 1353. Plaintiff's allegations do not satisfy these heightened requirements.

Plaintiff has identified three particular practices it contends violate GAAP and the Company's publicly-stated policies and thus result in improper revenue recognition.  Plaintiff contends these improper practices caused the Company's reported revenues and earnings to be materially overstated, causing NDC's financial reporting, as reported in press releases and Form 10-Q and 10-K disclosures filed with the SEC throughout the Class Period, to be materially false and misleading. Second, Plaintiff claims NDC's failure to write down its investment in MedUnite in a timely manner caused NDC's financial reporting to be materially false and misleading.  Plaintiff also claims the Company's specific disclosures regarding its write down of the MedUnite investment were misleading because the Company did not disclose the true value of the investment at the time of the particular disclosures. Finally, Plaintiff identifies several practices regarding amortization and capitalization

-31-

of software development costs it contends violated specific GAAP provisions, causing the financial results issued during the Class Period to be materially misstated. While Plaintiff has adequately identified specific, alleged financial statements, it does not allege sufficiently why each statement or omission was misleading, or sufficiently identify or contextualize information to meet the particularity requirement of Rule 9(b) or the PSLRA in securities cases. See Oxford Asset Mgmt., Ltd., 297 F.3d at 1194.

To state a claim under Section 10(b) or Rule 10b-5 of the Exchange Act, a complaint must allege the misstatement or omission of a material fact. Defendant moves to dismiss on the grounds that Plaintiff has failed to plead that Defendants made false and misleading statements.[14]

---

[14] Plaintiff apparently relies on the group-pleading doctrine to plead that certain statements conveyed in the Company's releases are the collective actions of the Individual Defendants. The Eleventh Circuit has not specifically ruled on the continuing viability of the group-pleading doctrine after the enactment of the PSLRA. It is unnecessary in this Order to evaluate the continued viability of the doctrine, but the Court notes it may well apply here. See, e.g., In re AFC Enters., Inc. Sec. Litig., 348 F. Supp. 2d 1363, 1371 (N.D. Ga. 2004) (finding group-pleading doctrine remains viable in appropriate circumstances). Application of the doctrine is particularly fair and appropriate in this case in which the alleged misrepresentations are contained in press releases and financial disclosures in which the Individual Defendants -- as Chief Executive Officer, Chief Financial Officer, President, and Vice President of Finance and Principal Accounting Officer -- were

A court, in reviewing a statement alleged to be an actionable misstatement or omission, must scrutinize the nature of the statement or omission to determine whether the statement was false when it was made.  If a complaint fails to plead facts that, if true, would constitute a misrepresentation, and does nothing more than offer the legal conclusion that a representation was somehow misleading, dismissal of plaintiff's claims is appropriate.  Oxford Asset Mgmt., Ltd., 297 F.3d at 1193-94.  "In other words, if no reasonable investor could conclude public statements, taken together and in context, were misleading, then the issue is appropriately resolved as a matter of law."  In re K-Tel Int'l, Inc. Sec. Litig., 300 F.3d at 897 (quotation and citation omitted).

In addition to being misleading, the alleged misrepresentation or omission must have been material to be actionable under the securities laws.  The Eleventh Circuit has held that the materiality element is satisfied if there is a substantial likelihood that disclosure of the omitted fact would have been viewed by the reasonable investor as having "significantly altered the total mix of information made available."  Oxford Asset Mgmt., Ltd., 297 F.3d at 1189 (quotation and

---

necessarily involved and under whose authority they were issued.

-33-

citation omitted).  Put another way, a misstatement or omission is material if there is a substantial likelihood that a reasonable shareholder would consider it important to an investment decision.  Basic, Inc. v. Levinson, 485 U.S. 224, 246-47 (1988). Conversely, "a fact is immaterial where a reasonable investor could not have been swayed by the misrepresentation."  In re K-Tel Int'l, Inc. Sec. Litig., 300 F.3d at 897 (quotation and citation omitted).

a.    *Improper Revenue Recognition*

Plaintiff claims Defendants engaged in improper revenue recognition by:  (1) granting exchange and return rights to VARs; (2) providing incentives and discounts that facilitated "channel stuffing"; and (3) granting advertising allowances to VARs without receiving identifiable benefits, and booking the discounts as revenue.  These three practices, which Plaintiff claims were interrelated, purportedly inflated the Company's earnings and caused NDC's financial reporting throughout the Class Period to be materially false and misleading.  Plaintiff identifies several GAAP provisions it contends the Company violated with these practices.  (See Compl. ¶¶ 58, 84-89.)

Plaintiff contends the Company also made misrepresentations when it stated its revenue recognition practices.  NDC's Form 10-Q for the quarter ended August

30, 2002, stated, "we recognize revenue when persuasive evidence of an agreement exists, delivery and performance has occurred, there is a fixed and determinable sales price, and collectibility is reasonabl[y] assured." (Compl. ¶ 105.)  The form further stated "we recognize revenue for sales of these type [of] products that are customer installed when the product is shipped." (Id. ¶ 106.)  Plaintiff claims these statements were false and misleading "because they were affirmative misrepresentations of NDC's revenue recognition practices in its Physician Services unit . . . ." (Compl. ¶ 107.)

Plaintiff contends Defendants' improper practices violated GAAP.  Plaintiff asserts the Company should not have booked revenue when it retained the risk of the VAR not selling the product, the Company's channel-stuffing practices increased the risk the Company would not be paid for the sale of products and the Company improperly booked discounts given to VARs for advertising purposes as revenue.

Defendants argue Plaintiff has failed to identify particular transactions or plead otherwise adequate allegations of fraudulent conduct.  They also contend that the financial reporting was itself accurate.  Defendants argue the reports accurately reflected the performance of the Company and that incentives offered were

-35-

permitted and Plaintiff's complaints about business decisions do not constitute a

securities violation.  The Court agrees.  Plaintiff's assertions are broad attacks on

the Company's practices and do not adequately identify fraudulent practices to

satisfy particularity requirements.  The following examples are illustrative.

- "... NDC allows a VAR to swap certain prior versions of a product for the like product of the latest version, subject to certain conditions. For example, if a new version of an existing software product is released, a VAR has the option to return its inventory of the previous versions at no cost."  (Compl. ¶ 38.)

- "A number of managers in the Physician Services division developed incentive programs for the VARs to account for 'cash-flow issues.' The sales managers were booking revenue when the product was ordered, not when it was paid for and fulfillment of the order was complete.  The incentive programs varied and separate deals were negotiated with different VARs, depending on their size and the volume of product they ordered.  According to this former executive, these incentive programs were created in order to meet internal Company quarterly and annual sales quotas . . . ."  (Id. ¶ 44.)

- "The channel manager also related that during the Class Period there were standard quarter-end discounts that sales managers were instructed to offer to VARs, and as the quarters progressed, these discounts became increasingly aggressive.  Toward the end of each quarter, the channel manager stated there was tremendous pressure to book more sales and the incentives grew more and more aggressive." (Id. ¶ 49.)

- "This discount was usually in the range of 35-52%, but was sometimes as high as 96% off the retail price of the product. . . . [T]he former senior executive stated that the Company did not actually

require VARs to use the discounts for advertising and did not receive such 'identifiable benefits,' at least not anywhere near the degree reported, as required by GAAP."  (Id. ¶ 58.)

These examples demonstrate Plaintiff has not satisfied its obligation to plead a detailed factual basis for its allegations of fraud.  See Oxford Asset Mgmt., Ltd., 297 F.3d at 1188 ("[C]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal.").  The absence of allegations about these transactions is striking.  Plaintiff provides wholly insufficient information to provide adequate context.  For example, how often these transactions occurred or the economic impact of them does not provide any basis to show whether the practices were anecdotal or widespread, involved hundreds or millions of dollars, or involved small or large groups of employees.  Plaintiff necessarily has to rely on speculative conclusions, which are inadequate to meet the fundamental pleading requirement in this case.  At most, Plaintiff alleges non-actionable corporate mismanagement.  See Santa Fe Indus. v. Green, 430 U.S. 462, 477 (1977).[15]

---

[15] Even if it is actionable under the securities laws because it does not comply with GAAP to fail to report refunds and advertising allowances in the manner in which they were described in the Complaint, Plaintiff has failed to provide any specific allegations on how refunds or allowances were granted here,

b.       *Failure To Write Down Investment In MedUnite In Timely Manner*

Plaintiff alleges the Company failed, in a timely manner, to write down its investment in MedUnite. Plaintiff alleges Defendants continued to report inaccurately the true value of the investment in press releases and SEC filings after it knew the value of the investment had been substantially diminished.

NDC's investment in MedUnite is alleged to have been valued at $53.2 million on August 19, 2002. On August 28, 2002, the Company announced in its Form 10-K for fiscal year 2002, that the Company was reducing the carrying value of its MedUnite investment to $12.2 million because the Company had determined that the value had declined. On September 23, 2002, Plaintiff alleges two of MedUnite's seven co-founders announced they had written down to zero their investments in MedUnite. On January 2, 2003, in response to ProxyMed, Inc.'s acquisition of MedUnite on December 31, 2002, NDC issued a press release stating it would reduce the carrying value of its investment in MedUnite to the amount realized in the sale. On March 19, 2003, the Company disclosed it would take a

the number or identity of VARs to whom they were granted, when, in what form and in what amount. In short, Plaintiff fails to provide the who, what, when, where, why or how of the alleged fraud.

charge of $11.6 million against the previously reported carrying value of $12.2 million.

Plaintiff claims NDC's public statements regarding the value of its investment in MedUnite were misleading "because Defendants knew at the time these statements were made that NDC's investment in MedUnite was worth much less than its reported $12.2 million carrying value . . . ." (Compl. ¶ 109.) Plaintiff claims NDC should have written down the investment "as early as August 2002, and certainly no later than early December 2002 . . . ." (Id. ¶ 128.)

Plaintiff further alleges the January 2, 2003 press release, in which the Company announced it would be reducing the carrying value of its investment in MedUnite was misleading because it did not disclose the extent of the required write down.[16] Plaintiff also claims the January 3, 2003 press release that revealed a write down was imminent was misleading because "it gave the distinct impression that the charge would be *de minimis.*" (Pl.'s Opp'n at 25.)

---

[16] Plaintiff further asserts that "By filing the form 10-Q on December 20, 2002 on a more expeditious basis than had been accomplished in the past, Defendants sought to avoid disclosing the necessity of an $11.6 million charge to earnings, which would have had a devastating effect on NDC's stock price . . . ." (Compl. ¶ 119.) There is no basis for this allegation and Plaintiff's conclusions are speculation that cannot give rise to a securities fraud claim.

The Company's public disclosures about the MedUnite investment were truthful, substantial and not misleading. The Company updated the estimated value of its investment in a failing asset at appropriate intervals, and Plaintiff has not demonstrated any improper conduct by Defendants. Plaintiff is complaining about the timing of Defendant's releases, but the facts alleged demonstrate the Company fully disclosed information in an expeditious manner.[17] This is demonstrated by Plaintiff's assertion that NDC should have disclosed the write down "certainly no later than early December 2002." NDC publicly disclosed it would be writing down the investment on January 3, 2003, and fully disclosed the size of the write down less than three months later.

The Company's disclosures adequately put any reasonable investor on notice that the MedUnite investment was deteriorating. However, Plaintiff asserts the public releases were misleading because they did not state at an early enough time the size of the write down, and allegedly implied the write down would be *de*

---

[17] That two co-founders of MedUnite wrote down their investments to zero on September 23, 2002, is not material. The Court cannot draw any inference of improper or misleading conduct from Defendant's conduct in comparison to that of two co-founders, when Plaintiff does not allege the other five co-founders have acted differently than NDC.

*minimus*.  The basis for Plaintiff's allegations is that two of the seven co-founders of MedUnite had taken write downs.  Plaintiff does not provide any information or explanation why these co-founders took their respective write downs, how their interests in MedUnite compared to NDC's or any other information to suggest that the other founders' decision to write down applied to NDC's interest in MedUnite.

"Generally, the issue of whether a public statement is misleading is a mixed question of law and fact for the jury.  The issue is appropriately decided as a matter of law, however, when reasonable minds could not differ.  In other words, if no reasonable investor could conclude public statements, taken together and in context, were misleading, then the issue is appropriately resolved as a matter of law."  In re K-tel, Int'l, Inc. Sec. Litig., 300 F.3d at 897 (quotation and citation omitted).  Viewing the Company's statements in context and in their entirety, the Court finds no reasonable investor could have been misled as Plaintiff claims, and Plaintiff failed to state a claim for violation of the securities laws.  See In re Flag Telecom Holdings, Ltd. Sec. Litig., 308 F. Supp. 2d 249, 265-66 (S.D.N.Y. 2004) ("[P]laintiff has failed to plead any facts that show [defendant] was able to estimate the amount of the write-down prior to its February 2002 statement especially in light of the fact the [defendant] predicted prices would decline in the Prospectus.").  See

In re BellSouth Corp. Sec. Litig., 355 F. Supp. 2d 1350, 1367 (N.D. Ga. 2005) (finding public statements regarding litigation risk were not materially misleading because "These series of disclosures and the specificity with which they were made compel the Court to conclude they gave the investing public . . . a clear picture . . . ."); Oxford Asset Mgmt., Ltd., 297 F.3d at 1193 (finding Defendants' disclosures sufficient to render statements not misleading; "In view of this and other candid statements about [the possible problems] that appear in the prospectus, we hold that the prospectus was not misleading in this respect."); Parnes, 122 F.3d at 548 ("Clearly, any reasonable investor would be on notice that Gateway faced potential state tax liability . . . and could not have been misled by the prospectus to believe that Gateway did not face such potential liability.")  The absence of any information to show for what reasons the minority of MedUnite's co-founders elected to write down their interest is sufficient reason alone to find these allegations insufficient to support Plaintiff's securities fraud claim.[18]

---

[18] Plaintiff asserts "it was not until March 19, 2003 that Defendants disclosed the true impact of the sale of MedUnite on NDC's financials, which caused the stock price of NDC to drop precipitously." (Compl. ¶ 75.)  It is undisputed Plaintiff purchased shares of NDC stock on March 10 and 11, 2004.  Plaintiff claims it has standing to pursue its claim because the MedUnite write down is simply part of a "common plan, scheme, and course of conduct . . . to fraudulently

c.    *Improper Capitalization And Amortization Of Software Development Costs*

Plaintiff alleges NDC capitalized costs associated with software development improperly, thus artificially lowering expenses and materially inflating earnings. Plaintiff claims the Company began capitalizing costs too early in a product's development, applied inappropriate and excessive burden factors to the amount it capitalizes, and amortized the capitalized costs of software development over a three to five year period even though the software allegedly generated revenue for only one year. Plaintiff claims these practices violated numerous accounting regulations, including Financial Accounting Standards Nos. 86 and 115. (Compl. ¶¶ 91-94.)

_____

inflate NDC's earnings . . . ." (Pl.'s Opp'n at 41-42 (quotation and emphasis omitted).) Because the Court finds Plaintiff has failed to plead adequately a claim based on the MedUnite write down, it need not determine whether Plaintiff has standing to pursue the claim. The Court notes Plaintiff's standing is not clear from the pleadings. Although Plaintiff states there is a continuing course of conduct, Plaintiff has not linked the MedUnite claim to its revenue recognition or software development claims for which Plaintiff's standing has not been challenged. The only facts alleged to link the claims are that each had the effect of inflating NDC's earnings. Such a vague and conclusory assertion is not sufficient to establish Plaintiff's standing to bring the MedUnite claim.

Plaintiff has alleged NDC violated numerous accounting regulations to artificially lower expenses and inflate earnings.  Plaintiff's allegations are thin, and are based almost entirely on statements by an undisclosed former executive in the Physician Services Group.[19]  For example, Plaintiff alleges:  "[M]ost every software product produced by NDC is expected to generate revenue only over one year, until the next version is released, which clearly renders a three or five year amortization period in contravention of FAS 86."  (Compl. ¶ 81.)  Again, Plaintiff's failure to provide factual flesh on the bones of conclusory claims is not enough to survive Defendant's motion to dismiss.[20]

### 3.    *Control Person Claims*

---

[19]  Plaintiff states the "full extent of [the improper capitalization practice's] impact on NDC's financials remains to be seen."  (Pl.'s Opp'n at 6.)  This kind of sheer speculation and conjecture is not appropriate in alleging claims under the Exchange Act and disregards the requirements of the PSLRA.  The Court can only evaluate the claims in this case on the basis of what is before it, not what Plaintiff hopes may develop.

[20]  Defendants finally contend Plaintiff failed to plead loss causation in connection with the allegations that NDC improperly capitalized and amortized certain software development costs.  Defendants claim Plaintiff has failed to allege that the truth about this claim reached the market and resulted in a decline in NDC's stock price.  Because the Court finds Plaintiff has failed to plead adequately a claim based on the capitalization and amortization of software development costs, it need not determine whether Plaintiff has pleaded loss causation.

The Individual Defendants move to dismiss the control person claim under Section 20 of the Exchange Act on the basis that Plaintiff has failed to plead an underlying violation. In light of the preceding discussion, Plaintiff has failed to plead a Section 20 claim. See Theoharous, 256 F.3d at 1227.

B.      Ernst & Young's Motion To Dismiss

E&Y moves to dismiss Plaintiff's Complaint on three grounds. First, E&Y contends Plaintiff's Complaint should be dismissed because it is an impermissible "shotgun pleading." Second, E&Y contends Plaintiff has failed to plead sufficient facts to give rise to a strong inference that E&Y acted with scienter. Third, E&Y contends Plaintiff's claims fail because Plaintiff impermissibly attempts to hold E&Y liable for statements not made by E&Y.

Plaintiff first named E&Y as a defendant in this case in the Second Amended Complaint. E&Y audited the year-end financial statements of NDC for its fiscal years ending May 31, 2002, May 30, 2003, and May 28, 2004. Plaintiff states "the only bases of liability asserted against E&Y" are the audit opinions issued for the 2003 and 2004 fiscal years. (Pl.'s Opp'n to E&Y's Mot. to Dismiss at 1.) Plaintiff alleges E&Y violated generally accepted auditing standards ("GAAS") and GAAP, despite public representations that E&Y had followed GAAS and GAAP, and

-45-

"[t]hese materially false and misleading statements facilitated the other Defendants' fraudulent and unlawful scheme to overstate revenues and earnings." (Id. at 4.) Plaintiff's claim against E&Y is dependent on Plaintiff having valid claims against the NDC Defendants. Because the Court has found Plaintiff has failed to state a claim against the NDC Defendants, Plaintiff's claims against E&Y necessarily fail. However, the Court also will address E&Y's argument that Plaintiff failed to plead scienter.

Plaintiff claims E&Y violated numerous GAAP and GAAS provisions by failing to properly conduct its audits and failing to perform correctly accounting functions. Plaintiff also claims several "red flags" put E&Y on notice of the Defendants' alleged fraudulent scheme. (Pl.'s Opp'n to E&Y's Mot. to Dismiss at 5-6.)

Plaintiff has not pleaded facts giving rise to a strong inference E&Y acted with scienter. Plaintiff claims two allegations demonstrate E&Y acted with scienter: (i) E&Y was "tipped" by an employee about the "dire situation" facing the Company in the Physician Services unit, (see Compl. ¶ 61), and (ii) the GAAP and

GAAS violations[21] are evidence of scienter.  (Pl.'s Opp'n to E&Y's Mot. to Dismiss at 15-17.)

The Court finds Plaintiff has failed to plead scienter with respect to E&Y for several reasons.  First, Plaintiff has failed to allege the Company violated the securities laws.  Second, Plaintiff has not attributed any conduct or motive to E&Y leading to a strong inference E&Y acted in a severely reckless or intentional manner.  "The amended complaint contains no allegations of motive and makes no suggestion that Ernst & Young received anything other than its usual fees for its work. . . .  [W]here motive is not alleged and plaintiff relies entirely on allegations of recklessness in asserting scienter, the evidence presented must be proportionally greater."  Zucker v. Sasaki, 963 F. Supp. 301, 308-09 (S.D.N.Y. 1997).  Although Plaintiff claims E&Y received a "tip" of alleged misconduct at the Company, Plaintiff also indicates E&Y took appropriate action after receiving this tip.  The

---

[21] Plaintiff asserts that E&Y would have discovered internal documents if it had complied with GAAS, and that these documents would have revealed the Company was not complying with GAAP.  Plaintiff claims the failure to review these documents was at least severely reckless.  (Pl.'s Opp'n to E&Y's Mot. to Dismiss at 16-17.)  This allegation, however, is not substantively different than Plaintiff's allegation that E&Y's scienter is demonstrated by its failure to comply with GAAS and GAAP.  Accordingly, the Court will analyze these allegations at the same time.

Complaint states "As a result of E&Y's notification, the Company and Defendants were forced to begin addressing the problem." (Compl. ¶ 61.) Rather than establishing an inference E&Y acted with scienter, this allegation leads to an inference that E&Y did not act in violation of the securities laws.

The Court finds Plaintiff has not alleged any motive on the part of E&Y, and must rely entirely on the alleged GAAP and GAAS violations. It is well established that allegations of GAAP and GAAS violations, without more, are not sufficient to establish scienter. See Ziemba, 256 F.3d at 1208. In this case, Plaintiff has not alleged E&Y ignored "red flags," or acted in such an outrageous manner as to justify a strong inference it acted in a severely reckless manner. The Court, therefore, finds Plaintiff's alleged GAAP and GAAS violations are insufficient to establish E&Y acted with scienter. See Zucker, 963 F. Supp. at 307 ("The mere misapplication of accounting principles by an independent auditor does not establish scienter. Rather, [plaintiff] must prove that the accounting practices were so deficient that the accountant's judgments were such that no reasonable accountant would have made the same decisions if confronted with the same facts."); In re Sunterra Corp. Sec. Litig., 199 F. Supp. 2d at 1337 (finding to be actionable under securities laws, "an alleged failure to comply with auditing

principles must be supported by specific factual allegations which support a strong

inference that the audit was so deficient that it amounted to no audit at all").

    C.    <u>Leave To Amend</u>

Plaintiff requests leave to amend the Second Amended Complaint in the

event the Court dismisses Plaintiff's claims.  (Pl.'s Opp'n at 46.)  Defendants argue

leave to amend should be denied because Plaintiff has already amended its

complaint twice and further amendment would be futile.

Federal Rule of Civil Procedure 15(a) provides leave to amend "shall be

freely given when justice so requires."  "A district court need not, however, allow

an amendment (1) where there has been undue delay, bad faith, dilatory motive, or

repeated failure to cure deficiencies by amendments previously allowed; (2) where

allowing amendment would cause undue prejudice to the opposing party; or (3)

where amendment would be futile."  Bryant v. Dupree, 252 F.3d 1161, 1163 (11th

Cir. 2001) (citation omitted).

The Complaint in this case was filed on April 7, 2004.  Plaintiff previously

has amended its complaint twice -- first on August 9, 2004 [9] and next on

September 1, 2004 [16].  Since the original filing of the Complaint, Plaintiff has had

five months to investigate its claims, including, as evidenced by the Second

Amended Complaint, numerous discussions with several unidentified confidential sources at the Company.

Plaintiff was on notice that Defendants likely would challenge the pleadings by filing motions to dismiss. (See Aug. 19, 2004 Order [12] (setting briefing schedule for motions to dismiss).) Plaintiff's counsel is experienced in securities class actions and has had significant time to carefully draft the Complaint. The Eleventh Circuit requires leave to amend be granted where a more carefully drafted complaint might state a claim. Here, the Court was inclined to deny Plaintiff's request for leave to amend the Second Amended Complaint. See, e.g., In re Sportsline.com Sec. Litig., 366 F. Supp. 2d 1159, 1174 (S.D. Fla. 2004) (dismissing plaintiffs' complaint with prejudice because the court "does not find fault with the drafting of said Complaint, but rather with the legal sufficiency of the facts alleged"). Plaintiff has not satisfied the PSLRA's pleading requirements, particularly with respect to scienter. Plaintiff has had unusual and apparently unfettered access to senior officials within the Company whose identities have been

kept confidential, and Plaintiff has still failed to meet its pleading burden.  Simply

put, Plaintiff's Second Amended Complaint falls far short of what is required.[22]

However, in the supplemental notices and pleadings submitted by the parties

after briefing on Defendant's Motion to Dismiss was closed, there is a suggestion

that additional facts may be available to the Plaintiff which were not available to

Plaintiff at the time it filed its Second Amended Complaint.  While they may not be

sufficient to overcome the deficiencies in the Second Amended Complaint before

the Court[23], Plaintiff should be offered one further opportunity to amend its

pleading.  The opportunity to amend, in the interest of fairness and to manage this

litigation efficiently, must be restricted.

---

[22]  In Bryant, the Court found amendment would not be futile because the plaintiffs indicated an amendment would allow them to meet the PSLRA's pleading requirements.  252 F.3d at 1164.  Plaintiff does not make that claim here.

[23]  The Court notes that Defendants have urged the Court to ignore Plaintiff's supplemental filings because "those documents do not bear on the fundamental question the Court faces in deciding the NDC Defendants' Motion to Dismiss -- namely, whether Plaintiff's allegations, *as pleaded in the Second Amended Complaint*, are critically deficient under the Reform Act's pleading standards." (NDC Defs.' Response to Lead Pl.'s Mots. for Judicial Notice of Supplemental Filings at 2.)  This suggests at least an implied acknowledgment these additional filings contain additional material which may at least be germane to the claims asserted.

Any amendment must identify clearly the additional matters alleged. Accordingly, Plaintiff may amend its complaint but the amendment is limited to allegations (i) based on information not available to Plaintiff when the Second Amended Complaint was filed and (ii) which bear only on claims already asserted. Plaintiff shall specifically identify its new allegations so the Court can easily identify and evaluate them. This shall be done by Plaintiff filing a pleading entitled "Third Amendment to Complaint" (the "Third Amendment"). The Third Amendment shall (i) incorporate by reference, in whole or in part, but without restating, the allegations of the Second Amended Complaint and (ii) state those new allegations Plaintiff seeks to assert to supplement the allegations previously asserted. If the new allegations are in addition to allegations in the Second Amended Complaint, Plaintiff may indicate in the Third Amendment the paragraph or paragraphs of the Second Amended Complaint which the new allegations supplement or modify. The Court believes permitting an amendment in this form, and which is limited to those facts identified since the filing of the Second Amended Complaint, strikes the appropriate balance between efficiency, fairness, and the obligation of the Court to manage litigation before it.

## IV.    CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that the NDC Defendants' Motion to Dismiss [26] and Ernst & Young's Motion to Dismiss [25] are **GRANTED** and Plaintiff's Second Amended Complaint is **DISMISSED WITHOUT PREJUDICE**.

**IT IS FURTHER ORDERED** that NDC Defendant's Motion to File a Supplemental Notice [29], Plaintiff's Motion for Leave to File Sur-Reply Brief or for Judicial Notice [39], Plaintiff's Motion for Judicial Notice of Supplemental Filings [42], Plaintiff's Motion for Judicial Notice of Supplemental Filings [43], and Motion of E&Y to Supplement Motion to Dismiss [49] are **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff shall file its Third Amended Complaint within thirty (30) days of entry of this Order, and Defendants shall file their motions to dismiss within thirty (30) days of the filing of the Third Amendment.

**SO ORDERED**, this 27th day of July, 2005.

_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE